**IN THE DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **Annette Mackey Bartle, on behalf of herself and other members of the putative class,** | **Case No. 20-00064-CV-V-GAF** |
| **Plaintiff,** | |
| **v.** | |
| **Fidelity Brokerage Services LLC,** | |
| **and** | |
| **National Financial Services LLC,** | |
| **Defendants.** | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

For her First Amended Class Action Complaint against Fidelity Brokerage Services LLC and National Financial Services LLC, (collectively, "Fidelity"), Plaintiff Annette Mackey Bartle ("Plaintiff") states and alleges as follows:

**INTRODUCTION**

1.     This is an action for breach of contract, breach of the implied duty of good faith and fair dealing and unjust enrichment.

**THE PARTIES**

2.     Plaintiff Annette Mackey Bartle ("Plaintiff") is a natural person residing in Jackson County in the State of Missouri.  At all times herein relevant, Plaintiff owned a retail brokerage account at Fidelity Brokerage Services LLC.  Plaintiff brings this action on behalf of herself and a class of similarly-situated individuals and entities as defined herein.

1

3.     Defendant Fidelity Brokerage Services LLC ("FBS") is a limited liability company organized under the laws of the State of Delaware.  It has a principal place of business at 245 Summer St., ZW9A, Boston, MA 02210.  It has the general character of a broker/dealer and performs brokerage and administrative services for owners of FBS brokerage accounts.

4.     Defendant National Financial Services LLC ("NFS") is a limited liability company organized under the laws of the State of Delaware.  It has a principal place of business at 245 Summer St., ZW9A, Boston, MA 02210.  It is an affiliate of FBS.  It has the general character of a broker/dealer and provides administrative, clearing, custody and margin credit services for owners of FBS brokerage accounts.

5.     Defendants FBS and NFS are collectively referred to in the agreement at issue as "Fidelity" and, accordingly, are collectively referred to herein as "Fidelity."

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 & 1332.

7.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

*The Basics of Investing*

8.     Investment securities such as stocks, bonds and exchange-traded funds typically are bought and sold through a brokerage firm.

9.     Buying or selling of securities through a brokerage firm requires a brokerage account.

10.    A brokerage account is an arrangement where an investor deposits money with the firm and the firm make trades on the investor's behalf.

11. Although the firm executes the orders, the assets belong to the investor, who typically must claim as taxable income any capital gains incurred from the account.

12. In general, there are two types of brokerage accounts: cash accounts and margin accounts.

13. In a cash account, all transactions must be made with available cash or long positions. When buying securities in a cash account, the investor must deposit cash to settle the trade or sell an existing position on the same trading day, so cash proceeds are available to settle the buy order.

14. In a margin account, the account owner can borrow against the value of the assets in the account to purchase new positions or sell short. Margin also can be used to make cash withdrawals against the value of the account as a short-term loan. When a margin balance is created, the outstanding balance is subject to a daily interest rate charged by the brokerage firm. These rates are based on the current prime rate plus an additional amount that is charged by the firm.

15. Although a margin account allows the account owner to borrow against the value of asserts in the account to purchase securities, this is a purely optional feature. The account owner may choose to utilize this feature periodically, regularly or not at all. Even where an account owner has been approved for margin borrowing, he or she can continue to purchase new securities using the assets in his or her account rather than borrowing from the brokerage firm.

16. Indeed, while a margin account can be viewed as a distinct type of brokerage account, it is equally accurate to view a margin account simply as a cash account with the added option of margin borrowing.

3

*Short Selling*

17.     One reason an investor may choose to open a margin account is to facilitate short selling.

18.     Short selling allows an investor to profit from the decline in the price of a particular security.

19.     To execute a short sale, an investor borrows stock through their brokerage company from someone who owns it. He or she then sells the stock, retaining the cash proceeds.

20.     The investor hopes that the price will fall over time, providing them an opportunity to buy the stock at a later date (up to the "expiration date") at a lower price than the original sale price. Any money remaining after buying back the stock is profit to the investor.

21.     By way of example, if an investor believes the price of ABC Company stock is going to decrease, he or she may borrow 10 shares of ABC at the current market price of $100 and sell it to another investor at that same time for that same market price. If the stock goes down to $90, the investor could buy the 10 shares back at $90. The short seller would then return the borrowed shares to the lender, who must accept the return of the same number of shares as was lent despite the fact that the market value of the shares has deceased. The short seller nets a profit of $10 per share. If, on the other hand, the price has risen to $120 at the expiration date, the short seller will be obligated to buy the share at that price, and he will lose $20 per share.

22.     Prior to the financial crisis in 2008, investors could engage in "naked" short-selling, which is the practice of short-selling a tradeable asset without first borrowing the

security.  Currently, however, shares must be borrowed in order for a short sale to take place.

23.      This "borrowing of shares" is facilitated by the brokerage firm; the borrowed shares may come from another investor's account, from shares being held in the brokerage firm's inventory, or even from another brokerage firm (through inter-brokerage firm lending arrangements). Regardless of the where the shares come from, however, the brokerage firm technically is the lender.

24.      Because the brokerage firm is making a loan (in the form of stock) to the short seller, it requires collateral.  This collateral is derived in part from the proceeds of the short sale (the sale of the borrowed stock to another investor).  The brokerage firm withholds these proceeds rather than distributing them to the short seller and utilizes them to secure the loan.  By regulation (Regulation T), a short sale must be collateralized by the short sale proceeds plus an additional margin requirement of 50% of the value of the short sale.

25.      The brokerage firm typically charges a transaction fee for facilitating a short sale, and also charges interest on the loan for as long as it remains outstanding (i.e., as long as the stock remains loaned out and has not been replaced or "covered").  A typical interest rate is U.S. prime rate plus 2%.

*The Unwitting Participant*

26.      Oftentimes, short selling involves an often-unwitting participant: the record owner of the borrowed shares.

27.      It is not uncommon for a brokerage firm to borrow shares from another investor's account to facilitate a short sale.  This borrowing/lending of shares is referred to as "hypothecation," and typically is allowed by the brokerage account agreement.

5

28.     Where shares are hypothecated from an investor's account, the account owner loses the voting rights associated with those shares as well as any dividends that were payable during the time the loan was outstanding.  In the case of hypothecated bonds and bond funds, the account owner loses the right to receive interest.

29.     Brokerage firms typically attempt to make up for lost dividends and interest with substitute payments to the account owner.  Importantly, these substitute payments are not dividends or interest, they are monetary payments in lieu of the dividends or interest the account owners otherwise would have received for the shares they owned.

30.     There is a specific line for these substitute payments on IRS Form 1099-MISC– Line 8, "Substitute Payments in Lieu of Dividends or Interest."  This is where the brokerage firm reports to the account owner and the IRS any payments of $10 or more the account owner received instead of receiving dividends or tax-exempt interest.

31.     There is an important distinction between substitute payments and dividends and interest.  Substitute payments are taxed as ordinary income at rates that can be as high as 37% depending on the taxpayer.  Dividends, on the other hand, are taxed at a maximum rate of 20%.   And interest may not be taxed at all where the underlying investment is a municipal bond or municipal bond fund.

32.     This difference in tax treatment can dramatically impact the investment earnings of an account owner.  By way of example, assume a brokerage firm borrowed 10 shares of ABC Company from an account owner and lent those 10 shares to a short seller for one year. During that year, ABC Company paid $1 in dividends for each outstanding share. Instead of receiving those dividends, the investor received $1 in "substitute payments in lieu of dividends." If the investor's other ordinary income qualifies them for the highest income tax bracket, they will pay 37 cents in income taxes on every $1 in substitute

payments. In sharp contrast, they only would have paid 20 cents in income tax on each $1 in dividends. They lost 17 cents on every share. Stated another way another way, in this example, the account owner lost 17% of the profit they would have received on dividend income.

33.    Some brokerage firms attempt to compensate for this difference in tax treatment by providing an annual credit to the account owner. This credit typically is calculated based on a predetermined formula which replicates the account owners' additional tax liability. The credit is reported as "Other income" on line 3 of IRS Form 1099-MISC.

*Fidelity*

34.    Plaintiff and the class own brokerage accounts at Fidelity.

35.    These accounts are governed by The Fidelity Account Customer Agreement, attached hereto as Exhibit A, and by the explanatory materials available on the Fidelity.com website.

36.    Fidelity hypothecated securities in these accounts during the class period and made substitute payments in lieu of the dividends and/or interest that Plaintiff and the class otherwise would have received.

37.    The hypothecated securities include stocks, municipal bonds, and exchange traded funds that are comprised of stocks or municipal bonds.

38.    Fidelity failed to credit these accounts an amount to compensate for the fact that substitute payments, unlike dividends and interest on municipal bonds, are taxed as ordinary income.

39.    Fidelity's failure to credit class members' accounts an amount to compensate for the fact that substitute payments are taxed as ordinary income materially impacts the

7

accuracy of the information Fidelity provides to customers regarding actual and potential investment returns.

40. By way of example, through the Fidelity.com website, an account owner interested in the SPDR® Nuveen Bloomberg Barclays Short Term Municipal Bond ETF ("SHM") can access the stated objectives of this product, view the prospectus and reports for this product, view the year-to-date returns for the product and the total returns over various periods of time, and view the top ten holdings of this product.

41. As a rule, municipal bonds and municipal bond funds such as SHM provide income that is exempt from federal income taxes. SHM's prospectus stated objectives are described as follows:

> The investment seeks to provide investment results that, before fees and expenses, correspond generally to the price and yield performance of the Bloomberg Barclays Managed Money Municipal Short Term Index. The fund invests substantially all, but at least 80%, of its total assets in the securities comprising the index and in securities that the Sub-Adviser determines have economic characteristics that are substantially identical to the economic characteristics of the securities that comprise the index. The index tracks the short term tax exempt municipal bond market and provides income that is exempt from federal income taxes. The fund is non-diversified.

42. Consistent with this idea, the before-tax returns and after-tax returns of SHM are shown as substantially similar if not identical in the SHM prospectus:

| Average Annual Total Returns (for periods ended 12/31/18) | | | |
|---|---|---|---|
| The after-tax returns presented in the table below are calculated using highest historical individual federal marginal income tax rates and do not reflect the impact of state and local taxes. Your actual after-tax returns will depend on your specific tax situation and may differ from those shown below. After-tax returns are not relevant to investors who hold Fund Shares through tax-advantaged arrangements, such as 401(k) plans or individual retirement accounts. The returns after taxes can exceed the returns before taxes due to an assumed tax benefit for a shareholder from realizing a capital loss on a sale of Fund Shares. | | | |
| | One Year | Five Years | Ten Years |
| Return Before Taxes | 1.39% | 0.84% | 1.59% |
| Return After Taxes on Distributions | 1.38% | 0.84% | 1.58% |
| Return After Taxes on Distributions and Sale of Fund Shares | 1.33% | 0.88% | 1.52% |

43.     The problem is that is when SHM and other municipal bond funds are hypothecated, the payment in lieu of interest the account owner receives is taxed as ordinary income.  As a result, the before-tax and after-tax returns may differ markedly.

44.     A similar problem arises with stock funds such as the Fidelity® Large Cap Core Enhanced Index Fund (FLCEX).

45.     As a rule, when Fidelity presents past returns for these funds, it does so by displaying "Hypothetical Growth of $10,000" over the year-to-date, or a 1-year, 3-year, 5-year, or 10-year period, all of which can be accessed on the Fidelity.com website.

46.     According to Fidelity's website: "1, 3, 5, and 10Yr performance numbers quoted are average annual total returns… Average annual total returns include changes in share price and reinvestment of dividends and capital gains."

47.     Yet, the "total returns" that Fidelity makes available on its website for this fund and others are inaccurate for any shareholder whose shares were hypothecated because substitute payments are not automatically reinvested in the manner dividends are.

48.     To be clear, the present lawsuit does not seek to recover for the inaccurate information Fidelity provides to customers regarding actual and potential investment return. This inaccurate information is merely a symptom of much more fundamental problem, namely, Fidelity's failure to credit class members' accounts an amount to compensate for the fact that substitute payments are taxed as ordinary income.

9

## Class Action Allegations

49.     Plaintiff brings this action pursuant to Fed.R.Civ.P. 23(b)(2) & (3).

50.     Plaintiff brings this action on behalf of herself and all persons and entities who (a) owned a Fidelity brokerage account, and (b) had securities hypothecated from that account during the ten-year period preceding the filing of this action (the "class period"), and (c) received a substitute payment in lieu of dividends and/or interest in connection with the hypothecated securities, and (d) failed to receive an annual credit to compensate for the fact that substitute payments are taxed as ordinary income. Excluded from the class are all judicial officers presiding over this or any related case.  The class definition also excludes all shareholders, officers and employees of Fidelity.  Plaintiff reserves the right to modify this class definition as discovery or other case circumstances warrant.

51.     Although the exact number of class members is presently unknown, Plaintiff alleges the class as presently defined will number in the tens if not hundreds of thousands.

52.     There are questions of law and/or fact common to the Plaintiff and the class members, including but not limited to:

> a.     Whether Fidelity is contractually obligated to provide a confirmation when it hypothecates securities;
>
> b.     Whether Fidelity is contractually authorized to hypothecate securities when there is no margin balance in the account; and
>
> c.     Whether Fidelity is contractually obligated to provide an account credit to every account owner who meets the stated eligibility requirements.

53.     Plaintiff's claims are typical of the claims of absent class members in that Plaintiff, like all the absent class members, owned a brokerage account at Fidelity, had

securities hypothecated from that account, received substitute payments in lieu of dividends or interest, and failed to receive an annual credit to compensate for the fact that substitute payments are taxed as ordinary income.

54. Plaintiff is a member of the class she seeks to represent.

55. Plaintiff is an adequate class representative in that, as a member of the class, her interests are aligned with those of the class.

56. There are no individual conflicts that would prevent Plaintiff from adequately representing the class.

57. Plaintiff has retained competent counsel experienced in class action litigation.

58. Class certification is proper because common questions of fact and law predominate over questions that may affect only individual members of the class.

59. A class action presents a superior form of adjudication over individual litigation.

60. The costs of litigating this action against Fidelity, in comparison to the recovery or relief sought, would make individual litigation impracticable. In addition, forcing individual litigation would risk the result of inconsistent rulings.

61. This class action is manageable. The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by this Court.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
**(Failure to Provide Confirmations)**

62. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

63. The Fidelity Account Customer Agreement constitutes a binding contract between the members of the putative class as defined herein and Fidelity.

64. The Fidelity Account Customer Agreement provides in pertinent part that Fidelity:

[W]ill also send out a confirmation for every securities transaction in your account. The only exceptions are automatic investments, automatic withdrawals, dividend reinvestments, and transactions that involve your core position, or the Intra-day Free Credit Balance; for these activities, your regular account statement serves in place of a confirmation.

65. This provision was and is a material and important term of the parties' contract, in that confirmations allow the account owner to know in real time whether there has been any activity in his or her account and the nature of that activity.

66. Fidelity breached this provision by failing to provide class members with confirmations when securities in their accounts were hypothecated.

67. As a result of this failure, class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated.

68. Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated they could not timely exercise their right to revoke Fidelity's authority to hypothecate securities in their accounts.

69. Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not modify their investment strategies to compensate for the effect of such hypothecation.

70. Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not take steps to

12

ensure they received payments in lieu of any qualified dividends or tax-exempt interest they were entitled to receive but did not receive as a result of the hypothecation.

71. Because class members could not and did not know in real time whether, when or which securities in their accounts were hypothecated, they could not take steps to ensure they received a credit to offset the differing tax treatment afforded payments in lieu of qualified dividends or tax-exempt interest and actual qualified dividends and tax-exempt interest.

72. Fidelity's breach caused class members suffered damages in an amount to be determined at trial.

## COUNT II:  Breach of Contract
### (Hypothecating Non-Collateralized Securities)

73. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

74. The Fidelity Account Customer Agreement constitutes a binding contract between the members of the putative class as defined herein and Fidelity.

75. The Fidelity Account Customer Agreement contains a separate section entitled, "Important Information about Using Margin and Its Risks."  The purpose of this section, as its title indicates, is to educate account owners of the rules that will apply if and when the account owner elects to buy securities on margin or to establish a short position.

76. This section provides in pertinent part as follows:

When you borrow on margin, the securities in your account become [Fidelity's] collateral for the loan to you.

\*          \*          \*

Fidelity can loan out (to itself or others) the securities that collateralize margin borrowing.

13

77.     These provisions were and are material terms of the parties' contract, in that they clarify when and under what circumstances Fidelity can loan out the securities class members' accounts.  In particular, these provisions clarify that Fidelity can loan out the securities in class members' accounts when class members borrow on margin or establish a short position.  At that point, the securities become collateral for the loan and are subject to hypothecation.

78.     Fidelity breached this position by hypothecating securities in class members' accounts even where class members had not borrowed on margin or established a short position.

79.     As a result of this breach, class members were improperly deprived of the voting rights, qualified dividends and/or tax-exempt interest associated with the hypothecated securities.

80.     Fidelity's breach caused class members to suffer damages in an amount to be proven at trial.

## COUNT III:  Breach of Contract
### (Failure to Provide Annual Credit)

81.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

82.     The Fidelity Account Customer Agreement constitutes a binding contract between the members of the putative class as defined herein and Fidelity.

83.     The Fidelity Account Customer Agreement contains a separate section entitled, "Fidelity's Commitments to You."  The purpose of this section, as its title indicates, is to educate account owners in general terms about Fidelity's contractual obligations.

84. This section provides, among other things, that Fidelity is "agreeing to serve as your broker" and "to provide, or acquire, various services and features, as described on the following pages."

85. Fidelity's brokerage services are described in detail on subsequent pages of the Fidelity Account Customer Agreement.

86. In particular, in a subsequent section entitled, "Fidelity's Brokerage Services," Fidelity explains that "[a]s a broker, we also offer you other services incidental to our brokerage services which can take the form of education, research, access to tools available on Fidelity.com, and guidance or advice designed to assist you in making decisions regarding the various products available to you."

87. Among the guidance offered on Fidelity.com is a page entitled, "Annual credit for substitute payments"

88. This page informs the account owner, among other things, as follows:

If shares were lent from your margin account during a period in which they would have earned dividends, you'll receive substitute payments to help make up for the lost income. However, unlike dividends, these substitute payments are taxed as regular income, with a tax rate as high as 37%. To help cover this additional expense, we offer the annual credit.*

**Who qualifies for the annual credit**

You may be eligible to receive the annual credit if:*

- You are a U.S. citizen or permanent resident.

- You received the substitute payment in an account registered as individual, joint, trust, estate, or "pass-through" entity type (partnership, LLC, LLP, etc.).

- You would have reported the dividend as a qualified dividend had the security not been on loan. (In general, you will be able to satisfy this requirement if the applicable security is from either a domestic or qualified foreign corporation, and would have been held unhedged for the period required for qualified dividends.)

**When you'll receive your credit payments**

Credits are paid between March and May of the following calendar year, or as soon as all reclassification information is available. Please note, in order to receive your credit, your account, or a qualified substitute, must be open.

**How we calculate your credit**

In general, your credit will be approximately 26.98% of your total substitute payments. For example, if you received $100 in substitute payments for the entire year, your annual credit adjustment will be $26.98.

We base this percentage on a number of factors. For instance, we assume your substitute payment will be taxed at the highest federal tax rate (37%) and then make further adjustments to account for any taxes the annual credit may incur.

**Where to find credits and substitute payments on your tax return**

We list substitute payments on line 8 and annual credits on line 3 of Form 1099-MISC.

89.     This is mandatory language.  Class members are told they will receive an annual credit if they meet specified eligibility requirements.  The only caveat—as indicated by asterisk—is that Fidelity reserves the right to amend or terminate the program.  To date, the program has not been terminated.

90.    This language confirms and clarifies Fidelity's contract obligations to Plaintiff and the class.

91.    Fidelity breached these obligations by failing to give an annual credit to cover the additional expense incurred by class members as a result of shares being lent from their accounts.

92.    As a result of this breach, Plaintiff and the class suffered damages in an amount to be determined at trial.

## COUNT IV:  Breach of the Duty of Good Faith and Fair Dealing
### (Failure to Provide Annual Credit)

93.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

94.    The Fidelity Account Customer Agreement constitutes a binding contract between the members of the putative class as defined herein and Fidelity.

95.    The Fidelity Account Customer Agreement contains a separate section entitled, "Fidelity's Commitments to You."  The purpose of this section, as its title indicates, is to educate account owners in general terms about Fidelity's contractual obligations.

96.    This section provides, among other things, that Fidelity is "agreeing to serve as your broker" and "to provide, or acquire, various services and features, as described on the following pages."

97.    Fidelity's brokerage services are described in detail on subsequent pages of the Fidelity Account Customer Agreement.

98.    In particular, in a subsequent section entitled, "Fidelity's Brokerage Services," Fidelity explains that "[w]hen we act as your broker-dealer, we are held to the legal standards under applicable federal and state securities laws, and the rules of self-regulatory organizations for broker-dealers such as FINRA. We are also subject to state insurance laws

relative to the sale of life and annuity products. Among other things, these regulations require broker-dealers to …[t]reat you in a manner characterized by principles of fair dealing and high standards of honesty and integrity."

99.     The implied covenant of good faith and fair dealing is read into and is an integral part of the Fidelity Account Customer Agreement as a matter of law.

100.    If it is determined that Fidelity did not breach the Fidelity Account Customer Agreement by failing to give an annual credit to cover the additional expense incurred by account owners as a result of shares being lent from their accounts, then Fidelity breached the implied covenant of good faith and fair dealing.

101.    By failing to give an annual credit to cover the additional expense incurred by account owners as a result of shares being lent from their accounts, Fidelity evaded the spirit of the Fidelity Account Customer Agreement and/or denied account owners the expected benefit of their bargain.

102.    While Fidelity may be contractually authorized under certain circumstances to hypothecate securities in an account owner's account, it would be unjust and unfair for Fidelity to shift the expense of this activity to the account owner by forcing the account owner to shoulder the additional tax liability associated with receiving substitute payments instead of qualified dividends or tax-exempt interest, all while failing to warn investors in real time that their securities had been hypothecated.

103.    Forcing the account owner to shoulder this additional tax liability would negatively impact the returns the account owner might reasonably expect to receive from particular investments and, indeed, might negate the rationale for those investments.  This is particularly true in the case of municipal bonds and municipal bond funds since the primary benefit of those products is that they produce tax-exempt income.

104.    Fidelity's breach of the implied covenant of good faith and fair dealing caused Plaintiff and the class to suffer damages in an amount to be proven at trial.

## COUNT V:  Unjust Enrichment
### (Failure to Provide Annual Credit)

105.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

106.    If it is determined that Fidelity did not have a contractual obligation to give account owners an annual credit to cover the additional expense they incurred as a result of shares being lent from their accounts, then Fidelity was unjustly enriched by failing to give such credit.

107.    Fidelity received a benefit from class members by being able to lend shares from account owners' accounts and to make substitute payments to account owners in lieu of qualified dividends or tax-exempt interest.

108.    Fidelity knew about and appreciated that benefit.

109.    Fidelity accepted and retained this benefit under such circumstances as to make it inequitable for Fidelity to retain the benefit without payment of its value.

110.    Plaintiff and the class seek equitable relief in the form of an Order requiring Fidelity to pay them the value of this benefit.

## COUNT VI:  Declaratory Judgment

111.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

112.    An actual and justiciable controversy exists between Plaintiff and Fidelity concerning Fidelity's rights and obligations relative to hypothecating securities.

113.    Plaintiff maintains that Fidelity can only hypothecate securities from accounts where a margin balance exists, must provide a confirmation to the account owner

19

each time securities are hypothecated, must make a substitute payment to the account owner in lieu of the dividends or interest the account owner would have received from the hypothecated securities, and must give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income.

114.     In sharp contrast, Fidelity has demonstrated through its actions that it believes it can hypothecate securities from accounts where there is no margin balance, need not provide a confirmation to the account owner each time securities are hypothecated, need not make a substitute payment to the account owner in lieu of the dividends or interest the account owner would have received from the hypothecated securities, and need not give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income.

115.     Plaintiff is entitled to a declaration clarifying Fidelity's rights and obligations in this regard so that, going forward, Plaintiff can make intelligent and informed investment decisions including the decision where to maintain a brokerage account.

## PRAYER FOR RELIEF

Plaintiff and the class pray for judgment in their favor as follows:

A.     An Order certifying Plaintiff's claims for class action treatment under Fed.R.Civ.P. 23(b)(2) and/or (b)(3);

B.     Judgment in favor of Plaintiff and the class on the claim that Fidelity breached the Fidelity Account Customer Agreement by failing to provide confirmations when securities were hypothecated;

C.     Judgment in favor of Plaintiff and the class on the claim that Fidelity breached the Fidelity Account Customer Agreement by hypothecating securities from accounts with no margin balance;

D.     Judgment in favor of Plaintiff and the class on the claim that Fidelity breached the Fidelity Account Customer Agreement by failing to provide an annual credit to all account owners meeting specified eligibility requirements;

E.     Judgment in favor of Plaintiff and the class on the claim that Fidelity breached the implied covenant of good faith and fair dealing by failing to provide failing to provide an annual credit to all account owners who received substitute payments in lieu of qualified dividends or tax-exempt interest;

F.     Judgment in favor of Plaintiff and the class on the claim that Fidelity was unjustly enrichment by retaining the benefit of hypothecating securities from class members' accounts while making them shoulder the additional expense associated with such hypothecation;

G.     Declaratory judgment in favor of the claim for Plaintiff and the class that Fidelity can only hypothecate securities from accounts where a margin balance exists, must provide a confirmation to the account owner each time securities are hypothecated, must make a substitute payment to the account owner in lieu of the dividends or interest the account owner would have received from the hypothecated securities, and must give the account owner a credit to offset the fact that substitute payments are taxed as ordinary income;

H.     An award of damages in an amount to be determined at trial;

I.     An award of equitable relief as appropriate for the claims asserted, including disgorgement of profits received by Fidelity when hypothecating securities from account owners' accounts without sending out confirmations of the securities transactions;

21

J.      An award of the reasonable costs and attorney's fees Plaintiff and the class

incurred in bringing this action; and

K.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the class hereby demand trial by jury on all issues so triable.


Respectfully Submitted,

BARTLE & MARCUS LLC

By _/s/ David L. Marcus_____
        David L. Marcus, MO Bar #47846
        BARTLE & MARCUS LLC
        116 W. 47th Street, Suite 200
        Kansas City, MO 64112
        Telephone: 816.256.4699
        Fax: 816.222.0534
        Dmarcus@bmlawkc.com

        and

THE LAW OFFICE OF JARED A. ROSE

        Jared A. Rose, MO Bar #60128
        919 West 47th Street
        Kansas City, MO 64112
        Phone: 816.221.4335
        Fax: 816.873.5406
        jared@roselawkc.com


**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this February 11, 2020, I served a copy of the foregoing document via this Court's CM/ECF System to the following:

John W. Shaw
James M. Humphrey, IV
BERKOWITZ OLIVER LLP
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
jshaw@berkowitzoliver.com
jhumphrey@berkowitzoliver.com

Andrew W. Stern
Jon W. Muenz
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
astern@sidley.com
jmuenz@sidley.com

Kathryn L. Alessi
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
kalessi@sidley.com

*Attorneys for Defendants*

 /s/ David L. Marcus
*Attorney for Plaintiffs*